Good afternoon. Illinois Appellate Court First District Court is now in session. The First Division, the Honorable Justice John Griffin presiding. Case number 1-9-1-2-8-6, Jane Doe versus Beu Perillo. Welcome. As you know each, would each attorney please state your name and spell your last name? My name for the record is Ronald F. Neville, N-E-V-I-L-L-E. I represent the appellate. Good afternoon, Your Honor. This is, Your Honors, this is Dan Velker, V as in Victor, O-E-L-K-E-R. On behalf of the appellee, Jane Doe. Welcome. As you both know, you each have 20 minutes. Does the appellant want to reserve any time? Yes, I'd like to reserve five minutes for a rebuttal. Okay. I think we're ready to proceed. Thank you. Good afternoon. My name again is Ron Neville. I represent the appellant. This case is about whether or not the trial court uh, committed an abuse of discretion and a palpable injustice to the defendant by not ruling on a meritorious motion for a new trial or because the judge thought he didn't have jurisdiction to do so, did not give the defendant ample opportunity to get a ruling from Judge Flannery on that motion. He gave you several opportunities. According to the record, it seems as though the judge held up the trial the first day and until about one o'clock. And then the next day, I think that the motion was filed, but maybe someone showed up at 1130 or so, showed up late. And it seems as if the judge gave quite a bit of time and just gave at least two opportunities, may not have given a third opportunity. And is that the issue that the third chance? I believe so, Judge. Yes. I believe that, uh, under all of the circumstances of which the trial court was aware, he should have given them another opportunity. What case law do you have that supports the third chance? Because that's where, that's where the issue seems to be, at least on that issue. That's that overwhelming matter. I guess, Judge, I don't have a, I don't We do have a case called Allman versus the Department of Registration and Education, which clearly held and has never been criticized or overruled in any respect that where a defense attorney as a family member who was ill, that that is a sufficient reason for a continuance. Right. And that's fine. That's why the judge said, that's why the judge asked you to go before the presiding judge could rule on that motion pursuant to the local rules, the administrative order, I should say. And they, and she tried to do that. But what, what we're overlooking here is that on the morning of the 15th, the motion was up at 11 o'clock. The judge started the trial jury selection at 930 or her mother. Now we're dealing with someone, Your Honor, who had chronic obstructive pulmonary disease. Well, I think it's important in the record. This is a serious issue. It's a serious real woman. And she quit. She got stuck. Can I, let me ask you a question. I'm sorry, Judge. We've read the record. We've read your briefs. Okay. And we have the affidavit from the mother from March. That's fine. Let's go back. How many times before January 7th, 2018? 19, Judge. 19. How many times was this case set for trial? I believe the first time it was set for trial was January 7th. It wasn't set for trial in November? If it was, Judge, I don't know that. Mr. Volker may be able to answer that question. Okay. That it might've been set for trial and nobody showed from the defense? Judge, that was the first I'm hearing of that. Then Ms. Murth was at court on January 7th. Is that correct? That is correct, Judge. She didn't say anything about her mother? No, she did not. She didn't even say anything at all, as I understand it. I wasn't there, Judge, but as best I can tell from all the affidavits is that both sides answered ready for trial. Right. And the case was continued to the following week. Okay. And what happened next? On January 13th, in the evening, Alison Murth, the defense attorney, filed an emergency motion for continuance. Now, is that emergency motion in the record? Yes. Where is it in the record? Give me the page. Could I have someone in the room look for it, Judge? Sure, that'd be fine. I'll give it to you before we end with this. Okay. But on January 13th, that's a Sunday, she tried to file a motion, two motions. She did file it. It was ultimately rejected, but it was filed. So she filed a motion on the 13th. Were there any affidavits attached to that motion? It was sworn to under a 1109 certificate. So there was no affidavit? There was no separate affidavit. Okay. And in that affidavit, what was the basis for the continuance? The primary reason for the continuance was the illness of our mother. Okay. And were there any other reasons? There were other reasons stated. She said that they had recently, Mr. Holstein had recently filed his appearance. She talked about some difficulties with witnesses, but the primary focus was her mother and the fact that she was the sole caretaker for the mom. Okay. And then after, did she try to file those motions wasn't clear from the record at the motion on Mr. Holstein and the motion for a continuance at the same time, or those filed at different hours? The two motions. Is that what you're asking me, judge? Yes. The first motion was filed in the evening of January 13th. First motion for continuance? Emergency motion for continuance. Okay. And what about the motion for, what time was that? I don't know exactly. I would say somewhere around nine o'clock in the evening. Okay. Then the following day, before that motion was heard at 11 o'clock, the case was assigned to judge Varga at 10 o'clock. All right. Before we get there, you said the Holstein motion for him. Oh, then the Holstein appearance. There was no motion. What time did she file that? The evening of the... You know what time? Approximately the same time she filed the emergency motion. You don't know that to be a fact. I'm not trying to... Oh, I know it to be a fact. I mean, through the affidavits. Because as I understand it, that motion has a different time date on it. Well, it has a time date on it. So not a motion, that filing has a time date on it. Are you talking about the appearance? Yes. I'd have to look at it. So then the next morning, is there anything in the record of her speaking with Mr. Holstein between the evening of the 13th, when her mother apparently needs her, and the following morning? Well, Mr. Holstein the following morning was aware of the situation. So I can only assume that they had a discussion. Okay. And Mr. Holstein went to court at the time of the cases being called? Mr. Holstein was in room 2005 at 10 o'clock when the case was assigned to Judge Varga. He did not step up because he had checked with the had not been filed. We will later find out it got rejected electronically. And so what happened next? The Ellison moved one before Judge Varga and explained the situation, presented him with the motion, and Judge Varga... Which motion? The emergency motion. Which emergency motion? The one filed on the 13th? The second motion, emergency motion, will not be filed until approximately noon on the 14th, perhaps between noon and one o'clock. So did she hand up a copy of the motion from the 13th to the judge? Yes. And it was called an emergency motion? And I assume she served the counsel for the plaintiff? Yes. Okay. Which, by the way, Judge, is that record, common law record 526. Okay. Thank you very much. And then what happened? Judge Varga said, I don't have authority to rule on this. Only Judge Flannery can rule on a motion for a continuance. Judge left the courtroom, went downstairs to try and speak to Judge Flannery, couldn't find him, came back up to the courtroom and said, I couldn't find Judge Flannery and your motion is not in the file. Wow. Sounds like he did an awful lot then. He got off the bench to go speak with the before the presiding judge, came back and told you I've searched for him. I wasn't able to find him, but I did learn that your motion was rejected. No, he just said it wasn't in the file. Okay. There was, he just wouldn't rule on it. He then... Wait, who's he? Judge Varga, excuse me. But Judge Varga asked you to, he gave you time to go and appear before Judge Flannery, not only that day, but also the next day. Well, he recessed at 1.30. Correct. Mr. Holstein and Ms. Muth went to the clerk and discovered that because a box stating confidentiality had been marked that the entire motion and the appearance were rejected. So she went to her office, she prepared a new motion and now included in that the fact that the defendant's father was in critical condition in Florida and that was filed and accepted. So wait, on the facts, there's something that you didn't discuss. When did she talk with her client? I'm not asking what the conversation was, but in the record, does it say what time she had a conversation and learned about her client's situation? The morning of the 14th. Do we know what time in the morning on the record? Just the record with the morning. My sense of it is before nine o'clock in the morning, but I couldn't give you a specific time. Well, if he was supposed to be on an airplane at 8.20, we would assume, and she didn't know he wasn't on an airplane, did she? She did not. Okay. So it had to be before, and if you go to the airport, I mean, at least before 8.20 sometime. So I can't answer that question, judge. I don't know what time the conversation was. Well, if it wasn't before 8.20, how would she know about it if he was on an airplane? Well, I mean, they had a conversation and that's all she knew is they had a conversation. I don't know what the conversation was other than the explanation about the father. Okay. Good. You know, let me just, we've been focusing on attorney Muth, but attorney Holstein, and I know there's some question of when his appearance was filed and things like that, but I know also that attorneys will cover for other attorneys without appearance being on file, that happens. And he was in the courtroom in 2005 at 10 o'clock. And I'm looking at the procedures for emergency motions, and it says emergency motions will be held at 11 o'clock. We know that. They must be signed up on the signup sheet outside 2005 between 10 and 10.30. So I don't even know that they need to be filed in advance. A courtesy copy should be presided to the law clerk in 2005 immediately after signup, and it's called, but why couldn't Mr. Holstein present the emergency motion? And he was actually there. I mean, he was actually in a room at the time when you'd be scheduling. Well, there's no question he could have gone up before the assignment judge and told the assignment judge there was a motion at 11 o'clock for an emergency continuance. I can't dispute that. What I can tell you is that he assigned an affidavit saying he felt it was improper for him to appear in a case where his appearance had yet to be filed. Again, I'm not trying to trick you on anything, but we have looked at in the record 526, and that is a post-trial affidavit in which Murth says she filed a motion on January 13th. That was not my question. I want to know, I could not find in the record a copy of what she filed, supposedly, or tried to file on January 13th. It's there. I mean, I looked at it yesterday. Okay, but that's not it. We will certainly get you, if you'd like, I'll send a copy over to your chamber. I don't want, just tell me where it is in the record. I have someone in the room looking right now. Okay. So, to go back, why didn't they get a court reporter over there then? Why didn't Allison Moose get a court reporter? Yeah. Well, she had been approached by the plaintiff's attorney prior, where they said they were going to have a court reporter. Doesn't matter. That doesn't matter. Well, I'm just telling you, that's what happened. I know that. I've read that. But that doesn't take the fact that there wasn't a court reporter. You can't blame the other side. How are you blaming the other side? It's your responsibility. You want a court reporter? You can have both have court reporters, whether they had one or not. If she stuck her head in, she would have seen there was no court reporter. Or if Holstein had stuck their head in, they would see there was no court reporter, right? They would. And I think they knew there wasn't a court reporter there. In a courtroom would know if there was or was not. They had that responsibility. I saw that argument. I think, Judge, you can't think of everything at one time. Looking back, should I have done this? And should I have done this? This was a very emotional and hectic day for her. Her mother said she was fine. And her mother's operation was weeks before. The fact is, and what got Judge Varga frustrated, was that in a civil case, the attorneys made a choice not to participate, correct? That was their choice. They could have participated. No one said they couldn't participate. How are they going to participate? The defendant wasn't there. You've never had a trial, I guess, where somebody wasn't there. Well, I've never had a trial, Judge, where the defendant wasn't there. I mean, it doesn't have to be there. This is not a criminal case, right? Am I correct? Right. Not a criminal case, correct? Not a criminal case without the defendant there. Right. That happens too. And here's a civil case. You don't need a client there. So, right? Am I right? Eventually, you would, because he was- Not eventually. I'm talking for the trial. Do you need, is there any rule that says any case is absolutely required, can't go to trial without a defendant there? No, there is no such rule. Okay. So, that goes to the wayside. I just don't think it goes to the wayside, Judge. I know. Because I think when you're working on a case, especially a case like this, you'd like to have your client with you to go forward with the case, to talk to your client. No. When the person is testifying to certain facts, you can communicate with- No, no, no, no, no. Let's go back over the facts. You told me this affidavit that, or this motion, filed on the evening of the 13th, which we seem not to be able to find in the record. You said- It's in the record. Well, you'll tell us- I'll get you that. But in that motion, it had nothing to do with her client. You said that. Well, she didn't know about it when she filed it. It only had to do with the mother. She didn't know- That's true. I'm not saying anything different. Yes, you are. Because how did she know, when did she know that a client wasn't showing up? The morning of the 14th. Well, then why didn't she tell the judge that- I mean, what did she tell the judge? What did they tell the judge? Anything about the client happening? At what point? At the point before the jury selection. She told him she had filed the emergency motion. Which emergency motion? The one that was filed on the January 13th. Okay, which had nothing to do with the client. Which did not mention the client. But she told him orally about her learning about the defendant's situation. She told him orally. But we don't have that in the record, so we don't know that, do we? No, there was no court reporter there. So, we can't take account of that, can we? Yes, you can. You have an affidavit to that effect. No, I mean, I don't know. The affidavit to what effect? That she told the judge? That's what she says in her affidavit. So, even if the client's not there, apparently their thinking was, didn't they know by Tuesday whether the client was available or not? Whether the client was available? Yes. No, because they thought he was going to be available. He's told the morning of the 14th about his father, is my understanding. Or late, very late, early in the morning of the 14th. I don't know exactly when. Well, his affidavit, I mean, I don't know. I mean, he has an affidavit that he says is full of lies, and then he has another affidavit. So, we don't know, you know, what is what. But I don't think it's full of lies, Judge. I think it... Well, but let's just say that there were untruths. And one of the untruths is that he heard about his father on the evening, Sunday evening. Okay. I don't know if that's true or not. I mean, he says at one place, he's in another place. But you're telling me that Mirth didn't know until the 14th. Did she tell... So, why... And we know from his truthful affidavit that you would say would be truthful, the second one, which recants everything in the first one, that it turned out he didn't have to go. They didn't ask him to go. He didn't leave on the evening. What happened was, is he learned that they were considering an air ambulance from Florida to the University of Chicago, where his doctors were. That, in fact, happened on the 16th. It was just a situation that he didn't want to be flying to Florida and his father being flown back to Chicago. So, he never left. He did that. No, he did that. So, he could have been at the courthouse on the 14th, on the 15th. Well, physically, I guess, yes, he was in Chicago. He could have been there. Emotionally, I'm not sure that he could handle it. But nobody, you know, again, he's in town. You know, whether she knew or not, there's a record reflect whether she knew that he was in town on the 14th. No, she did not know that. Do you know on the 15th? I, did she know on the 15th? I'm not, I cannot truthfully answer that, Judge. I'm not sure. Okay, we're pretty much out of time. Does anybody have anything else? And, of course, you've reserved some time, so. Yeah, I'll just point out to Mr. DeVille that his, I do see that his emergency motion for continuance of the trial was filed on the 14th, and it's page 342, or 339 of the record. Judge, we think the first, I'm sorry, we think the first motion is at 335. Well, it makes, the actual motion is 339. There's an affidavit at 335. That's on the 14th. That was on the 14th, correct? But we're, but the 13th one is the one I can't find. The one on the 13th was rejected, so I think it was refiled on the 14th, and the one on the 13th doesn't show in the record. Well, I don't know if it was, I don't know if it was refiled. I mean, that's. Well, they say it was. I'm going, but, well, I actually do see a file stamp copy on the 14th, though. Yes, there is a file stamp copy on the 14th. What I understand the facts are, though, is on the 13th, she did not know about the 14th. Client's father. And that was not in the affidavit on the 13th. And that wasn't what we have on the 14th. That's correct, Justice. Our problem, our problem logistically right now, Judge Hyman, is that the appellate record is on our computer, and I need to go to that. Is there some other way I can get you that information? Just tell our clerk, you know, later today, just tell our clerk where we can find the record. That's fine. That's all I meant. But before we leave you, I just, I don't want, I mean, I spent a lot of time on the facts, because I think they're very important, what happened here and the opportunities to appear, to have a court reporter, to participate in a trial. We have two lawyers, and to stand in the hallway and let this continue. I don't see the case law, you know, the case law is not that strong for you, but there's a lot of money involved. And so I don't want to cut you off at all. What do you say is your best argument, why we should reverse the judgment? Because the substance of the motion was meritorious. There's case law, specifically Allman versus the Department of Registration. That specifically holds where an attorney's family member is ill, that is sufficient excuse for a continuance. So the motion had merit. Let me ask you, the judge has to take, can I question the information in an affidavit that says somebody's family member is ill? We've, no, you can't. We've cited a case in our brief that you can't have counter affidavits. Certainly a judge has a right to ask questions and do what judges do. But generally, affidavits can't be opposed on that situation. We did cite a case in our brief to that effect. Okay, so that's your best argument? Well, my best argument is that because the motion had merit, Judge Varga should have done more than he did. He could have ruled on it. He could have sent it to Judge Flannery, the case back to Judge Flannery for a ruling. Or he could have given them the additional day they needed to get a ruling. And with all that was at stake here, and the result of a $9 million judgment, I don't think that's asking for a lot. It's not uncommon for a child judge to knock a case over for several days for a variety of reasons. And I think that's the engravement of this case. And he kept referring to it. She had two strikes. If I did it, she would just have made a third mistake. Well, I don't think that's the appropriate way to take a look at it. And standard of review is abuse of discretion on that? Do you have discretion without question? No, no, no. Our standard of review is did the judge abuse his discretion? The question is, did Judge Vargas abuse his discretion? Yes. And did you want to respond to the punitive damages? I'm sorry, were you asking me a question, Judge? Did you want to respond to the punitive damages? Well, I mean, our logic of the punitive damages, we believe that you have to analyze punitive damages, the defiance decision, and you have to deal with the degree of reprehensibility, the disparity between the harm suffered and the punitive damages award, and the difference between the award and civil penalties. And we just believe that for all the reasons we expressed in our brief, that eight times compensatory damages is an excessive award. And the case cited by the plaintiff's attorney was State Farm, which held that. It talked about punitive damages should be more in the nature of three to four times. And when you get beyond that, you have a constitutional issue. If we were going to affirm, then maybe we should reduce the punitive damages in half? Why? I don't think there should be punitive damages or compensatory damages. I think this case should be reversed and remanded. Other than that, but my preamble, my hypothetical was, if we affirm. Cut them in half? Yes. No, I mean, I'm unprepared to answer that question, Judge. Um, because I'd need some thought to give that some thought as to whether or not, uh, you can even do that. First of all, if you have the authority to do that. And then second of all, um, um, I even think, I even think half would be too much. If you want to do anything in rebuttal, that'd be fine. Thank you. Okay. Thank you. Counsel. Thank you, runners. Again, this is Dan Velcro on behalf of the appellee, Jane Doe. First of all, I wanted to start out by, by kind of picking up on the questions that you were asking. There is no doubt from the record that the attorneys for the defendant in this case, for the appellant in this case, made a deliberate decision not to defend their client. That was clear by, that's clear by the record. It's clear by the admissions of Mr. Holstein and Ms. Muth. It's clear by the judge's decision where he, uh, uh, recited the fact that counsel would peer through the door of the courtroom during the trial of the case. Counsel sat through the, uh, the jury deliberations and was there when the jury returned the verdict in this case. Um, the only attempt that Ms. Muth made, uh, to attempt to try to divert the finality of this case was she walked into the courtroom as the record shows and attempted to present a motion for mistrial while the jury was in the middle of deliberations. Now, while she made a unsubstantiated claim that she was not allowed to participate in the jury instruction conference, which is not true, um, when she walked in the courtroom, the judge was instead simply managing the exhibits, organizing the exhibits to make sure that what the jury was given was precisely what had been approved and received in the bottom, uh, right or left hand corner. Um, so let me ask, uh, was this on January 7th? Was that the first time this case was set for trial? As far as I know, your honor, but I'm not positive on that, but I do, I do know that on the 13th, cause I was there when the case was actually assigned to judge Varga on, I believe the 10 o'clock call Mr. Holstein was in the courtroom. And when the case was called, did not approach the bench, did not approach the judge and did not indicate therefore that there was any problem with it being assigned trial that day on the 13th. Um, once the case reached judge Varga's courtroom, both Mr. Holstein and Ms. Muth were in the courtroom and, and both were just on the record. I don't want anything that's not in the record. Well, I think it's in his, it's in his decision. It's in his, his rulings that he, that he rendered regarding the, uh, the, the way in which the trial proceeded. So, um, and I think Mr. Judge made it clear in his order, your honor, that he asked Mr. Holstein to participate. And Mr. Holstein said he was not prepared to participate and walked out of the courtroom. Um, I see a different issue and I'm not clear on this from the record. So maybe you can help me. And I probably should have asked Mr. Noble this question as well. The issue here is though the case had been assigned to judge Varga on the 13th and there was a motion before judge Varga for continuance. And I realized that the administrative order provides that those motions are to go before the presiding judge or his designee or her designee, his or her designee. But there are under certain circumstances that the administrative order is clear that the trial judge still has discretion to deal with some delays, uh, probably in the case of a long continuance. And I think you've mentioned this in your brief, uh, in the case of a long continuance, the case of course needs to go back to the presiding judge or, or his or her designee. But in terms of a short time to give them time to get their motion on file, it seems as though Mr. Neville implies that judge Varga did not know that he had discretion. And I'm of the mind that when a judge does not know that he or she has discretion in a situation that that is in fact an abuse of discretion. So I'm trying to get clear. Did judge Varga tell you all that he had no discretion to, to hold up the case? I don't remember him using that language, your honor. He simply said that the matter had to be taken up with, with, uh, the presiding judge and he directed this move to present it to the presiding judge, gave her an opportunity to do that on month on the 13th. She agreed to do it. Again, as counsel mentioned in his argument, we waited around for her until, I don't know, maybe, maybe two o'clock, two 30. And then rather than allowing me to proceed, the judge said, let's come back tomorrow. Ms. Muth agreed in court to come to present her motion the following day on Tuesday, the 14th, and then we would meet after she presented her motion. She proceeded to be a non-event didn't appear. And therefore around 1130, 11, 1130 that day, the judge proceeded to, to, um, uh, impanel a jury. And he questioned, It sounds as though judge Varga did exercise some discretion. He did, your honor, because he told, he told Ms. Muth that he thought she should present it to the presiding judge. That's the way the, the court About one 30 that day, so that she would have the next morning to do that. Correct. And the judge left the courtroom. I know this isn't the right, he left the courtroom on several occasions to go down and talk to judge Flannery to find out what he should do. I think he was a little bit, you know, concerned as to what he should do. And, and for some reason, I don't know the answer to this. It would have to come from Ms. Muth. Neither Ms. Muth nor Mr. Holstein presented the motion, the emergency motion for a continuance. It's flabbergasting because when we came out of the judge's chambers on the, on the 14th, after having a lunchtime jury instruction conference, which is traditional Mr. Holstein was back in the antechambers walking around where lawyers aren't committed to walk. And said, how did it go and said, is there a court reporter in the corner of it. I said, no. And he followed us out and then disappeared until he and Ms. Muth would peer through the door during the trial and the, and the jury's deliberations. Then coming into the courtroom and sitting down patiently and waiting for the jury to deliver it. So in answer to your question, I do think the judge, you know, fully understood his, his, his, his rights and his obligations, but he was following protocol and he made it crystal clear. As he says in his decision, his orders that he made it crystal clear to Ms. Muth that she would go down to judge Flannery and present the motion. And she agreed to do that. And that's why he kicked the trial for an additional day, which I thought was extraordinary to allow her to do whatever she needed to do. But apparently just didn't do it. So that's all I really know about that process. The judge did invite, and he did state in the record, he invited Mr. Holstein to take a seat at council table and defend his clients. And Mr. Holstein respectfully declined, exited the courtroom on his own, you know, volition. So I don't know what more the judge could have done, nor would he have had any expectations that he needed to do anything more than what he did under the circumstances. Were you served with the motion of January 13th, Sunday night? Yeah. My recollection, your honor, is we received it by email. Either Sunday night or Monday morning. Because we all knew that she had a motion she was going to present. And she was there in the courtroom. So it didn't come as a surprise to us. Frankly, we waited for about what came to about 28 hours. More than a full day for her to make, to present her motion. And as far as I know, she never presented it. So we were aware that there was a motion pending, and so was the judge. And he, frankly, bent over backwards to give her every opportunity to present it. And I think, you know, not only is this a case, your honors, where the defendant's attorneys made a deliberate attempt for whatever, deliberate decision for whatever reason, not to defend their client. This is a case where the defendant himself deliberately failed to appear at the trial of this case. You know, essentially, I hate to use the term, but he basically lied about his whereabouts. He wasn't on a plane at 820 in the morning on Tuesday, the 14th. He was in Chicago. And he was purposely avoiding being present during the trial of this case. He submitted that. So I suppose, you know, in terms of all the lengthy legal arguments that were made in the brief by the appellant, you know, to some extent, I don't want to recite anything unless you'd like me to go through the details. But our position is that these objections to the jury instructions, these objections to the exhibits that were introduced into evidence, have all been waived. And to the extent there, I think your honors mentioned this, and you're questioning, the law is clear in this state that it is the duty of the parties seeking a reversal and appeal to point to create a record, first of all, and then to point to the record that supports their position. And the failure to do that is, that destroys your opportunity to claim any kind of an error in this case. There was no- Let me ask you about the principal argument that the defendant's raising here. And that has to do with a case that said if a lawyer has an affidavit saying that there's a family emergency because of illness, that is enough and should be granted immediately or without question. What's your response to that? Well, in the cases we cited in our brief, your honor, is that a motion for continuance is not automatically granted. It's within the discretion of the trial court or the court hearing the motion to make that decision. So I don't think there is any case authority in the state that if you submit a motion to continue the trial, that the court has to accept it and grant it as a matter of course. The court still has discretion to deny the motion. Under the circumstances, we're not going to ever know what Judge Plano would have done, I suppose, because he wasn't presented with the motion in the first instance. I don't think you can make the argument that you filed something electronically and it was rejected or accepted, but you failed to present it to the judge. And therefore, it nevertheless gives you a right to claim error in a trial. You made a concerted decision not to appear and defend. Otherwise, it would open the door to gamesmanship that would have no end. And I think that's why Judge Varga in this case, who's a jurist for 24 years, said in his decision that he's never seen any efforts as audacious as this in an attempt to undermine the judicial process, because that's exactly what the defendant and his counsel, unfortunately, have tried to do. This case was tried fairly and legitimately, and the defendant and the defendant's counsel made no effort to defend whatsoever. In terms of the punitive damage award, the punitive damage award was not based on any passion or prejudice. There's no evidence in the record to support that. It's within the constitutional limitations of due process. And the defendant failed to appear to argue for a number that was smaller than the number that was awarded by the jury. The jury based their decision based on the evidence they heard of sexual and physical assault. They based their decision on the photographs of Ms. Doe that are in the record. They based their decision, I'm sure, on the text messages from Mr. Aparello, the defendant in this case, who threatened to murder her if she stopped seeing him in the future, as well as acknowledging that he had choked her on one occasion in connection with one of the beatings that were at issue in the case. So the punitive damage award, it is what it is. It's not constitutionally excessive, and we would argue that it should stand, because the jury in this case, without a question, it was a jury of 12 people, obviously made a decision here that they wanted to send a message to the community that this kind of behavior, that this kind of treatment is intolerable. So, Your Honor, for all those reasons, unless you have specific questions of me, I would rest on the position we've taken thus far. All right. Thank you very much, Mr. Belkin. Thank you. Neville? I'd like to address this question of whether Judge Varga exercises discretion. If you read the transcript of the post-trial motion, it is absolutely clear that he said he had no authority to rule on such a motion. You can't claim someone's exercising their discretion when they say, I can't touch this motion, I can't rule on it, I can't consider it, I just don't have the authority to do that. He did exactly what Justice Walker said. He thought he didn't have the discretion, and that's an abuse of discretion in and of itself. Second, to make something of Mr. Holstein is supposed to sit down and try this case. When you read his affidavit, he was only in the case for a couple of days. He had never spoken to the defendant. He had surface knowledge of the facts. He was going to second-chair it. He was going to help Ms. Smooth with perhaps objections, keep the exhibits in order, what second-chairs do in cases like that. He was not qualified at that point in time, given his lack of understanding of the facts and the fact he never met or spoke to the defendant to represent that client. So, saying that… Was that never stated in his appearance? Say it one more time, Judge. In his appearance, did he state, I'm only here for a limited purpose? He told Judge Varga that. It's in the affidavit. It's in the affidavit a couple months later. I'm talking about at the time of the trial. He's there. His appearance is a full appearance. His appearance wasn't in any way limited in scope, was it? I don't think you can file an appearance and say, I'm going to be a second-chair. Well, you can. But that was the reality of it. There's a limited scope of appearances in Illinois. Yeah, for other reasons, not for that. Well, if your client agrees. But in any event, you're saying there was no limited appearance. So, he was there for all purposes. Well, I don't agree with that, Judge. The reality of life is that different attorneys who all have appearances on a case have different obligations, depending whether they're a first-chair, second-chair, or third-chair. And the fact that they filed a general appearance doesn't change that reality. And the reality is that Mr. Holstein could not competently represent the defendant under the circumstances. He could present the motion for continuance, don't you think? Yes, he could have. This conspiracy that everyone suggests, not everyone, Mr. Volker suggests existed. There's no evidence that they sat down and said, hey, the way to beat all of this is we'll just not go into the courtroom. To read the entirety of the appellate record, Ms. Booth is trying to get a ruling from Judge Flannery, but because of the circumstances, was unable to do it. All that Judge Varga had to do is give him one more day. And we're not talking about a plaintiff's case that was complicated. Only she testified, they had some exhibits, and there were no experts. So no one would be severely hurt. Who are these two witnesses? Have they identified anywhere in the record that she said in her affidavit there were two witnesses that weren't available? In her motion, Judge, which, by the way, is at record 566-567, she refers to them as critical eyewitnesses. Do we know who they are? Were they ever identified? I know. I mean, I remember seeing names. I'm just saying in the record. Is there anything in the record? I don't think the names are in the record. I'm not positive of that, but I don't. And everybody, I mean, Mr. Volker tries to present a situation where Muth had the opportunity to present it to Judge Flannery and just didn't do it. That's not the case. She was home with her mother on the 14th. She got, she left when she could. She got caught up in traffic and she got there late. She tried to get the clerk to have it called. They said, no, you come back tomorrow. And she even went up to Judge Evans' courtroom to see if she could get some relief up there and didn't get any. So there was no conscious abandonment here. She was trying to do what she felt was best at the time, and that was get a ruling on the motion. Okay. Anybody have anything else? Not by the appellate. All right. Well, thank you very much. We really appreciate it. Appreciate all your hard work. And we'll be taking this under advisement. And you'll be hearing from us fairly soon. Justice Hyman, are you still supplying a page number to Justice Hyman? Well, I just wanted to ask Justice Hyman if that's sufficient, the page numbers, or do you want me to send over a copy? No, page numbers are fine. If you find it, just- Well, that's what I've got. I've got 566 and 567. 566 and 567 is the motion. Where's the motion she filed on the 13th? Yes, I have a file stamp copy, and I'm looking at it right now. Okay. 566 and 567. I appreciate it. Thank you. All right. Well, thank you. You'll be hearing from us. Thanks very much. Thank you. Appreciate it.